RONALD P. SCHILLER (PA SBN 41357; Pro hac vice appl. pending)
SHARON F. MCKEE (PA SBN 81499; Pro hac vice appl. pending)
BONNIE M. HOFFMAN (PA SBN 201140; Pro hac vice appl. pending)
**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 568-6200
Facsimile: (215) 568-0300
Email: rschiller@hangley.com
       smckee@hangley.com
       bhoffman@hangley.com

Douglas K. Wood, Esq. (SBN 121804)
Robin L. Singer, Esq. (SBN 252981)
**MORRIS POLICH & PURDY LLP**
One Embarcadero Center, Suite 400
San Francisco, CA 94111-3619
Telephone: (415) 984-8500
Facsimile: (415) 984-8599
Email: dwood@mpplaw.com
       rsinger@mpplaw.com

Attorneys for Plaintiff
IRONSHORE SPECIALTY INSURANCE COMPANY

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IRONSHORE SPECIALTY INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>23ANDME, INC.,<br><br>    Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT** |

Plaintiff Ironshore Specialty Insurance Company ("Ironshore") brings this Complaint for declaratory judgment in its favor and against defendant 23andMe, Inc. ("23andMe"), and in support of the Complaint avers as follows:

**Introduction**

1.  Ironshore seeks a declaration from this Court concerning its obligations to 23andMe under the Products/Completed Operations Liability and Professional Liability Policy for Life

Sciences policy, No. 001306701, (the "Policy") that Ironshore issued to 23andMe for the policy period of March 19, 2013 to March 19, 2014.  (A true and correct copy of the Policy is appended as Exhibit A.)  In particular, Ironshore seeks a declaration that it does not have a duty to defend or indemnify 23andMe (1) in lawsuits and arbitrations where the underlying plaintiffs seek restitution, disgorgement and other forms of relief that are not insurable under the Policy or the law, and; (2) with respect to a Civil Investigative Demand, which does not qualify as a **Claim** under the Policy.

### The Parties

2. Plaintiff Ironshore Specialty Insurance Company is a corporation organized under the laws of the State of Arizona with its principal place of business in the State of New York.

3. Defendant 23andMe, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of California.

### Jurisdiction and Venue

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the dispute is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because 23andMe has its principal place of business in Mountain View, California.

### The Underlying Claims

6. 23andMe describes itself as a personal genetics company dedicated to helping individuals access and understand their personal genetic data.  Upon information and belief, at all times relevant hereto, 23andMe marketed and sold its "Personal Genome Service" ("PGS") to consumers who wished to obtain genetic information concerning their health and ancestry.

7. Consumers who wished to obtain the PGS testing service entered into a contract with 23andMe to purchase a DNA saliva collection kit (the "DNA kit").  After receiving the DNA kit, consumers who chose to proceed sent a saliva sample back to 23andMe for testing.

8. When 23andMe received the laboratory results, it posted the DNA information to the purchaser's personal account on 23andMe's website.  This information included the raw data, analyses, ancestry and health-related profiles.

9. Upon information and belief, in or before 2009, 23andMe began to engage in discussions with the U.S. Food and Drug Administration ("FDA") concerning FDA clearance and approval for the PGS.

10. Upon information and belief, on or about June 10, 2010, the FDA issued correspondence to 23andMe stating that "23andMe has never submitted information on the analytical or clinical validity of its tests to FDA for clearance or approval" and directing 23andMe to "take prompt action to respond to [its] letter."

11. On November 22, 2013, the FDA sent a "Warning Letter" to 23andMe. The FDA asserted that 23andMe was violating the Food, Drug and Cosmetic Act by selling PGS without marketing clearance or approval, and detailed a number of concerns that the FDA had with the health component of the PGS. The FDA further asserted that 23andMe had expanded the uses of PGS beyond those submitted to the FDA and had broadened its marketing campaigns without FDA authorization. The FDA required 23andMe to discontinue marketing PGS (except its ancestry component and raw data) until 23andMe received marketing clearance and approval for PGS.

12. Upon information and belief, 23andMe subsequently stopped offering the health component of PGS to new customers.

13. On November 27, 2013, the first of several putative class action lawsuits was filed in the U.S. District Court for the Southern District of California. The lawsuits were subsequently transferred to the U.S. District Court for the Northern District of California, where they were consolidated for pretrial purposes under lead case Tompkins v. 23andMe, Inc., Civ. A. No. 5:13-5682 (hereinafter, the "Federal Court Cases").

14. 23andMe moved to compel arbitration and dismiss the Federal Court Cases.

15. On June 25, 2014, the Court entered an order granting a motion by 23andMe to compel arbitration of the Federal Court Cases and dismissing the Federal Court Cases. See Tompkins, Civ. A. No. 5:13-5682, dkt. 109.

16. On or about December 27, 2013, other plaintiffs filed an arbitration complaint, Livingston v. 23andMe, Inc., AAA Arb. 11 122 1662 13, with the American Arbitration Association.

1  (A copy of the complaint is appended as Exhibit B.)  The Livingston plaintiffs seek to represent a
2  class of all persons who purchased PGS in the United States.

3        17.      On or about February 3, 2014, Ironshore received from 23andMe an additional AAA
4  arbitration complaint captioned Davis-Hudson v. 23andMe, Inc.  (A copy of the complaint is
5  appended as Exhibit C.)

6        18.      Plaintiffs in the underlying actions, including the Livingston arbitration, (individually
7  and collectively, the "Underlying Plaintiffs") allege that 23andMe has falsely marketed PGS since
8  2007 as a device that is intended for use in diagnosing health conditions and preventing disease.

9        19.      The Underlying Plaintiffs contend that 23andMe falsely represented in advertisements
10 that PGS would give purchasers knowledge into their health conditions and their status as carriers of
11 genetic disorders.

12       20.      The Underlying Plaintiffs contend that the results provided by 23andMe were
13 inaccurate and incomplete.

14       21.      The Underlying Plaintiffs further allege that 23andMe did not apply for FDA approval
15 of its PGS until 2012, although 23andMe should have done so before marketing the PGS.

16       22.      The Underlying Plaintiffs allege that after 23andMe applied in 2012 for FDA
17 clearance, the FDA requested further information and 23andMe failed to respond to the FDA's
18 requests, which led the FDA to issue its Warning Letter.

19       23.      The Underlying Plaintiffs allege that 23andMe sought to mislead consumers that the
20 PGS had received government approval.

21       24.      The Underlying Plaintiffs also contend that 23andMe plans to use the genetic
22 information it gathers about its customers to create a database that 23andMe can later market to
23 physicians and pharmaceutical companies. The Underlying Plaintiffs assert that 23andMe's intentions
24 are not adequately disclosed to consumers.

25       25.      The Underlying Plaintiffs contend that they would have paid less for the PGS or would
26 not have purchased the PGS if they had known the truth concerning the PGS.  They seek return of the
27 fees that they paid for PGS and disgorgement of profits that 23andMe has allegedly earned.

28

1    26.   The Underlying Plaintiffs do not contend that they suffered any injuries or damages
2  other than the out-of-pocket cost of the PGS.

### The Coverage Dispute

4    27.   In December 2013, 23andMe notified Ironshore of proposed class action lawsuits filed
5  by two of the Underlying Plaintiffs, Lisa Casey and David Tompkins.

6    28.   Ironshore reviewed the complaints in both actions and on December 23, 2013
7  Ironshore advised 23andMe that the Policy did not provide coverage for the Casey and Tompkins
8  actions.  (A copy of the December 23, 2013 letter is appended as Exhibit D.)  Ironshore fully reserved
9  all of its rights.

10    29.   On January 7, 2014, through its counsel at Orrick, Herrington & Sutcliffe LLP
11 ("Orrick"), 23andMe requested that Ironshore reconsider its coverage decision, contending that the
12 Casey and Tompkins actions were either covered under the Policy's Professional Liability coverage
13 part or potentially covered, triggering a duty to defend.  23andMe subsequently also requested
14 coverage on the same grounds for the Livingston arbitration and lawsuits filed by other Underlying
15 Plaintiffs.

16    30.   On February 25, 2014, Ironshore notified 23andMe that based on the allegations in the
17 Underlying Plaintiffs' complaints there might be potential coverage for purposes of triggering
18 defense under California law.  Therefore, Ironshore agreed to defend 23andMe in accordance with the
19 terms of the Policy, while fully reserving Ironshore's rights including the right of recoupment.  (A
20 copy of the February 25, 2014 letter is appended as Exhibit E.)  In its letter, Ironshore discussed in
21 detail a number of Policy provisions that could bar or limit coverage for the underlying actions.  (See
22 id.)

23    31.   In accordance with California Civil Code § 2860, and without waiving any of its rights
24 under the Code or the Policy, Ironshore agreed that 23andMe could retain independent counsel,
25 Orrick, subject to reasonable attorney rates pursuant to California Civil Code § 2860.

26    32.   Orrick, acting on behalf of 23andMe as defense counsel in the underlying actions as
27 well as coverage counsel, has submitted bills to Ironshore that seek payment of excessive and
28

unreasonable attorney's fees and costs, as well as attorney's fees and costs that are not covered under the provisions of the Policy.

33. On April 25, 2014, 23andMe, through its counsel at Orrick, responded to Ironshore's February 25, 2014 letter and disputed numerous issues raised by Ironshore in its letter. 23andMe also advised Ironshore of two new lawsuits and a Civil Investigative Demand, and requested coverage for these matters as well.

34. On July 16, 2014, Ironshore notified 23andMe that there might be potential coverage for purposes of triggering defense under California law for the Civil Investigative Demand and the additional lawsuits (even though those actions, which were part of the Federal Court Actions, had been dismissed). Therefore, Ironshore agreed to defend 23andMe in accordance with the terms of the Policy, while fully reserving Ironshore's rights including the right of recoupment. (A copy of the July 16, 2014 letter is appended as Exhibit F.) In its July 16 letter, Ironshore incorporated its February 25, 2014 letter and discussed in detail a number of Policy provisions that could bar or limit coverage for the Civil Investigative Demand, including that the Civil Investigative Demand does not demand "**Damages**," as defined by the Policy, nor does it demand services or non-monetary relief. (See id.)

35. Although Ironshore and 23andMe have continued to discuss the coverage issues, they have been unable to resolve their disputes.

36. After a recent mediation of the underlying actions, the Underlying Plaintiffs made a settlement demand, a portion of which 23andMe contends is covered by the Ironshore Policy.

37. Because 23andMe has been incurring defense costs and litigation in arbitration is moving forward, raising the prospect of further settlement demands or a potential award, there is an actual controversy between the parties, and declaratory relief will serve a useful purpose in clarifying and settling the legal relations in issue while affording relief from the uncertainty, insecurity and controversy giving rise to this proceeding.

/ / /

/ / /

I088471.DOC                                         6
**COMPLAINT FOR DECLARATORY JUDGMENT**

**Policy Terms and Conditions**

38. The Professional Liability Insurance insuring agreement of the Policy states in pertinent part:

> We will pay **Damages** that the **Insured** becomes legally obligated to pay because of a Claim alleging a **Wrongful Act** by the **Insured** or by a party for whose conduct the **Insured** may be legally responsible in rendering or failing to render **Professional Services** (including in the course of a **Human Clinical Trial**), provided that:
>
> 1. the **Wrongful Act** takes place on or after the Retroactive Date and prior to the expiration date of the **Policy Period**;
>
> 2. the **Wrongful Act** takes place in the **Coverage Territory**; and
>
> 3. the **Claim** was first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period, and was reported to us as required by SECTION V, Condition A. A **Claim** will be deemed first made as set forth in SECTION V, Condition B. . . .

(Ex. A, § I.B.)

39. The Policy has limits of liability, per occurrence and in the aggregate of $10,000,000.

40. The Professional Liability Insurance coverage part is subject to a self-insured retention of $50,000.

41. The Policy defines a "**Claim**" as follows:
> **Claim** means a written demand for **Damages**, services or other non-monetary relief. A **Claim** includes a **Suit**.

(Ex. A, § VII.F.)

42. The Policy defines a "**Suit**" as follows:
> **Suit** means a civil proceeding seeking recovery of **Damages** (or **Damages** plus services or other non-monetary relief) because of a **Wrongful Act**, **Bodily Injury** or **Property Damage** to which this insurance applies. **Suit** includes a civil legal proceeding as well as an arbitration proceeding or alternative dispute resolution proceeding in which such **Damages** are claimed and to which the insured must submit or does submit with our consent. **Suit** does not include a criminal proceeding.

(Ex. A, § VII.AAA.)

43. The Policy defines a "**Wrongful Act**" as follows:
> **Wrongful Act** means any actual or alleged negligent act, error or omission in the rendering of, or failure to render **Professional Services** to which this insurance applies.

(Ex. A, § VII.GGG.)

44. The Policy defines "**Professional Services**" as follows:

**Professional Services** means services of a professional nature performed by you or any other Insured on your behalf, including advice given by you with respect to the use of **Your Product** or **Your Work** for a fee, remuneration or other consideration in connection with a **Life Sciences Product**.

(Ex. A, § VII.WW.)

45. The Policy defines "**Damages**" as follows:

**Damages** means damages in excess of the applicable **Self-Insured Retention** and within the applicable Limit of Liability which are incurred by any **Insured.**

**Damages** shall include:

**Punitive or Exemplary Damages**

(1) where insurable by law; provided, that the law of the jurisdiction most favorable to the insurability of **Punitive or Exemplary Damages** shall control the insurability of such damages, so long as such jurisdiction:

    (a) is where such **Punitive or Exemplary Damages** were awarded or imposed;

    (b) is where the act, error or omission giving rise to the liability took place;

    (c) is where the **Named Insured** is incorporated or otherwise organized, or has a place of business;

    (d) is where the Underwriter is incorporated or has its principal place of business; or

    (e) is where the parent company of the Underwriter is incorporated; and

(2) awarded in a judgment that also awards compensatory damages covered by this Policy.

Coverage for such **Punitive or Exemplary Damages** shall be subject to, and not in addition to, the Limits of Insurance set forth in Item 5 of the **Declarations**.

Notwithstanding the above, an award of **Punitive or Exemplary Damages** against an **Insured** may not be recoverable under the Policy if a court of law in the jurisdiction in which enforcement of the Policy is sought does not recognize such coverage provided under this Policy or if the court of law granting an award of **Punitive or Exemplary Damages** prevents the **Insured** from collecting payments under this Policy.

**Damages** do not include:

1. civil or criminal fines, sanctions, penalties or forfeitures;

2. the multiplied portion of multiplied damage awards;

3. non-monetary, injunctive, declaratory or equitable relief or amounts owing in order to effectuate such relief;

4. the return, refund or restitution of fees or other charges for **Your Product**, **Your Work** or your services;

5. amounts incurred to modify, redesign or correct **Your Product**, **Your Work** or your services, other than expenses covered under Insuring Agreement D.

6. amounts that are not insurable under any applicable law; or

7. plaintiff's attorney fees associated with any of the remedies listed in (1) through (6) above.

**Punitive or Exemplary Damages** covered by this Endorsement and paid by the **Insured** will serve to erode the Deductible or Self Insured Retention amounts referenced in Item 6 of the **Declarations.**

(Ex. A, End. 6.)

46. The Policy defines "**Punitive or Exemplary Damages**" as follows:

**Punitive or Exemplary Damages** means punitive or exemplary **Damages** but does not include such **Damages** imposed on account of intentional, willful or wanton conduct or egregious disregard for the life or health of person, or civil or criminal fines or penalties imposed by any federal, state or local governmental body or authority.  However, if such **Damages** are imposed on account of intentional, willful or wanton conduct or egregious disregard for the life or health of persons, then such **Damages** shall be covered by the Policy, but only such damages as are assessed directly against the **Named Insured** resulting from the acts of employees acting on their own without the knowledge of or discretion from the **Named Insured**.

(Ex. A, End. 6.)

47. "**Defense Expenses**" are included within and erode the limits of liability.

48. "**Defense Expenses**" are defined as follows in pertinent part:

**Defense Expenses** mean the reasonable fees of attorneys, experts and consultants and other costs and expenses incurred in investigating a **Claim** or **defending** a **Suit** (other than costs and expenses of our **Employees**).  **Defense Expenses** also include:

[. . .]

2. the cost of bonds to release attachments, but only for bond amounts within the applicable limit of liability. (We do not have to furnish these bonds);

3. all reasonable expenses incurred by you at our request to assist us in the investigation or defense of the **Claim** or **Suit**, including actual loss of earnings up to $250 a day because of time off from work;

4. all costs imposed against you in the **Suit**;

5. pre-judgment interest awarded against you on that part of the judgment we pay.  If we make an offer to pay the applicable limit     of liability, we will not pay any pre-judgment interest based on that period of time after the offer; and

6. all interest on the full amount of the covered portion of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the covered portion of the judgment that is within the applicable limit of liability.

(Ex. A, § VII.L.)

49. The Policy also contains a number of exclusions that bar or limit coverage for the underlying actions.

50. The Contractual Liability exclusion states:
This **insurance** does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B . . . which are based upon, arising out of, directly or indirectly resulting from or in any way involving . . . [y]our assumption of liability or obligations in a contract or agreement.  This exclusion does not apply to liability or obligations:

a. that you would have in the absence of the contract or agreement; or

b. that you assumed in an **Insured Contract**, provided the **Bodily Injury, Property Damage** or **Wrongful Act** occurs subsequent to your execution of the **Insured Contract**.  However, this exception for liability you assumed in an **Insured Contract** only applies to the extent of any limits or coverage required by the **Insured Contract**.  Solely for the purposes of the coverage provided by this subparagraph (b), we will treat as **Damages** any attorneys fees or litigation expenses for which you are liable under such **Insured Contract**.

(Ex. A, § IV.A.1.)

51. The Prior Acts exclusion states:
This insurance does not apply to **Damages** or **Defense Expenses** incurred in **connection** with a **Claim** under Insuring Agreements A or B . . . which are based upon, arising out of, directly or indirectly resulting from or in any way involving . . . an **Occurrence, Wrongful Act** or **Circumstance**:

a. disclosed in your application of insurance or any accompanying documents provided to us; or

b. of which you had knowledge or information, prior to the first inception date of continuous claims-made coverage with us, which knowledge or information a reasonable person would believe might result in a **Claim**.

**COMPLAINT FOR DECLARATORY JUDGMENT**

        This includes any **Occurrence, Wrongful Act** or **Circumstance** which began or took place before the inception date of Policy and which is covered under any batch, integrated occurrence or extended coverage language in any other policy issued to you prior to the inception date of this Policy.  We may, in our discretion, agree to cover such matter by Endorsement.

(Ex. A, § IV.A.7.)

    52.    The Banned Materials exclusion states:

        This insurance does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B . . . which are based upon, arising out of, directly or indirectly resulting from or in any way involving . . . **Your Product** or **Your Work** that is manufactured, developed, designed, created, tested, sold, leased, licensed, rented, handled, marketed, distributed or disposed of by you or others on your behalf in known violation of any law, statute, ordinance or regulation.

(Ex. A, § IV.A.13.)

    53.    The Dishonest, Fraudulent, Criminal or Malicious Acts exclusion states in pertinent part:

        This insurance does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B . . . which are based upon, arising out of, directly or indirectly resulting from or in any way involving . . .

    a.    willful misconduct or willfully dishonest, fraudulent, criminal or malicious act, error or omission by any **Insured**; or

    b.    willful violation by any **Insured** of any law, statute, ordinance or regulation.

        However, . . . we will defend the **Insured** against such **Suit**, unless or until it has been determined that this exclusion applies.  Determination of the applicability of this exclusion may be made by an admission or by a final adjudication in a proceeding constituting the **Claim** or in a proceeding separate **from** or collateral to any proceeding constituting the Claim. . . .

(Ex. A, § IV.A.14.)

    54.    The Misappropriation of Funds exclusion states:

        This insurance does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B . . . which are based upon, arising out of, directly or indirectly resulting from or in any way involving . . . the conversion, commingling, misappropriation or improper use of funds or other property, or the gaining of any personal profit or advantage to which the **Insured** is not legally entitled.

(Ex. A, § IV.A.15.)

55. The Insured's Fees or Other Remuneration exclusion states:
> This insurance does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B . . . which are based upon, arising out of, directly or indirectly resulting from or in any way involving . . . a dispute over fees, remuneration or other compensation charged by the Insured for Professional Services.

(Ex. A, § IV.A.16.)

56. The Personal and Advertising Injury exclusion provides that the Policy's insurance does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** which are based upon, arising out of, directly or indirectly resulting from or in any way involving **Professional and Advertising Injury**, which is defined as follows:
> **Personal and Advertising Injury** means injury, including consequential **Bodily Injury**, arising out of one or more of the following offenses:
>
> [. . .]
>
> 5. oral or written publication, in any manner, of material that violates a person's right of privacy . . . .

(Ex. A, § IV.A.18, § VII.PP.)

57. The Off-Label Promotion exclusion states:
> This insurance does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B . . . which are based upon, arising out of, directly or indirectly resulting from or in any way involving . . . your promotion of off-label or unapproved uses for drugs or medical devices approved by the Food and Drug Administration for other uses.

(Ex. A, § IV.A.21.)

58. The Policy further provides that "We have no duty to provide coverage under this Policy unless you and any other involved Insured have fully complied with the Conditions contained in this Policy."  (Ex. A, § V.)

59. As a Condition of coverage, the Policy provides:
> A **Claim** will be deemed to have been made at the earlier of the following times:
>
> 1. when any **Executive Officer**, member of your legal or risk management departments or any other person responsible for your insurance administration first receives written notice of such **Claim**; or
>
> 2. when we receive written notice of such **Claim**.

I088471.DOC                                12
**COMPLAINT FOR DECLARATORY JUDGMENT**

> All **Claims** for **Damages** arising out of one **Wrongful Act** or **Related Wrongful Acts** shall be deemed to be one **Claim**, regardless of the number of claimants or the number of **Insureds** against whom such **Claims** are made. Such **Claim** will be deemed to have been made at the time of the first of those **Claims** is made against any **Insured.**

(Ex. A, § V.B.)

60. As a further Condition of coverage, the Policy provides:

> If other valid and collectible insurance is available to you for a loss we cover under this Policy, our obligations are limited as follows:
>
> 1.  Primary Insurance
>
>     This insurance is primary except when paragraph 2 below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in paragraph 3 below.
>
> 2.  Excess Insurance
>
>     This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:
>
>     a.  that is effective prior to the beginning of the **Policy Period** shown in the Declarations of this insurance and applies to **Bodily Injury, Property Damage** or **Damages** on other than a claims-made and reported basis, if:
>
>         (i)  no Retroactive Date is shown in the Declarations to this Policy; or
>
>         (ii) the other insurance has a **Policy Period** which continues after the Retroactive Date shown in the Declarations of this Insurance;
>
>     b.  that is a local foreign admitted policy which is a claims-made policy effective during the **Policy Period** or an occurrence based policy which provides coverage for the **Claim** at issue.
>
>     When this insurance is excess, we will have no duty to defend the **Insured** against any **Suit** if any other insurer has a duty to defend the **Insured** against that **Suit**.  If no other insurer defends, we will undertake to do so, but we will be entitled to the **Insured's** rights against all those other insurers.
>
>     When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:
>
>     a.  the total amount that all such other insurance would pay for the loss in the absence of this insurance; and
>
>     b.  the total of all deductible and self-insured amounts under all that other insurance.

> We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declaration of this Policy.
>
> 3. Method of Sharing
>
> If all of the other insurance permits contribution by equal shares, we will follow this method also.  Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
>
> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits.  Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all Insurers.

(Ex. A, § V.D.)

61. Upon information and belief, 23andMe has other insurance that may cover all or some of the claims asserted in the underlying actions.

**FIRST CAUSE OF ACTION**

**DECLARATORY JUDGMENT, 28 U.S.C. § 2201**

62. Ironshore incorporates the allegations of the foregoing Paragraphs of this Complaint as though fully stated herein.

63. Ironshore is entitled to a judicial declaration that it does not have a duty to defend or indemnify 23andMe in the underlying actions or, alternatively, that Ironshore is entitled to recoupment for any settlements, damages, attorney's fees and costs that are not covered under the Policy.

64. Ironshore is entitled to a judicial declaration that the underlying actions do not seek, in whole or in part, relief that meets the Policy definition of **Damages**.

65. Ironshore is entitled to a judicial declaration that the underlying actions do not seek, in whole or in part, relief that is insurable under applicable law.

66. Ironshore is entitled to a judicial declaration that the attorney's fees and costs sought by 23andMe do not qualify, in whole or in part, as **Defense Expenses** under the Policy and may not be recovered at law.

67. Ironshore is entitled to a judicial declaration that the underlying actions, including without limitation the Civil Investigative Demand, do not qualify as **Claims** under the Policy.

68. Ironshore is entitled to a judicial declaration that coverage for the underlying actions is barred or limited, in whole or in part, by the Banned Materials Exclusion.

69. Ironshore is entitled to a judicial declaration that coverage for the underlying actions is barred or limited, in whole or in part, by the Dishonest, Fraudulent, Criminal or Malicious Acts Exclusion.

70. Ironshore is entitled to a judicial declaration that coverage for the underlying actions is barred or limited, in whole or in part, by the Insured's Fees or Other Remuneration Exclusion.

71. Ironshore is entitled to a judicial declaration that coverage for the underlying actions is barred or limited, in whole or in part, by the Personal and Advertising Injury Exclusion.

72. Ironshore is entitled to a judicial declaration that coverage for the underlying actions is barred or limited, in whole or in part, by the Off-Label Promotion Exclusion.

73. Ironshore is entitled to a judicial declaration that Ironshore's obligations toward 23andMe are limited by other primary or excess insurance available to 23andMe.

74. Ironshore is entitled to a judicial declaration that 23andMe's claim for coverage is barred or limited, in whole or in part, by other terms of the Policy, including but not limited to, the Contract Exclusion, Prior Acts Exclusion, and/or the Misappropriation of Funds Exclusion, or otherwise does not come within the grants of coverage of the Policy, including the definitions of **Wrongful Acts** or **Professional Services**, and is barred by applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Ironshore requests that judgment be entered in its favor and against 23andMe, Inc., and asks this Court to:

    a. Determine, decide, adjudicate and declare the rights and liabilities of the parties hereto with respect to the Policy;

    b. Determine, decide, adjudicate and declare that there is no duty to defend or indemnify 23andMe under the Policy;

      c. Determine, decide, adjudicate and declare that Ironshore is entitled to recoup any amounts Ironshore paid for which it is determined that coverage is or was not afforded under the Policy; and

      d. Award Ironshore all costs and expenses incurred in the matter, and grant any such other and further relief which this Court deems just and proper.

Dated: July 21, 2014                           MORRIS POLICH & PURDY LLP

                                             By:   */s/ Douglas K. Wood*
                                                    Douglas K. Wood
                                                    Robin L. Singer

                                            Attorneys for Plaintiff
                                            IRONSHORE SPECIALTY INSURANCE COMPANY

                                            HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

                                            By:   */s/ Ronald P. Schiller*
                                                    Ronald P. Schiller
                                                    Sharon F. McKee
                                                    Bonnie M. Hoffman

                                            Attorneys for Plaintiff
                                            IRONSHORE SPECIALTY INSURANCE COMPANY