UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IRONSHORE SPECIALTY INSURANCE COMPANY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>23ANDME, INC.,<br><br>　　　　Defendant. | Case No. 14-cv-03286-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR STAY**<br><br>[Re: ECF 26] |

This declaratory relief action arises out of an insurance coverage dispute between Plaintiff Ironshore Specialty Insurance Company ("Ironshore") and its insured, Defendant 23andMe, Inc. ("23andMe"). Ironshore seeks a declaration that a professional liability policy issued to 23andMe does not give rise to a duty to defend or indemnify 23andMe with respect to certain lawsuits, arbitrations, and other legal proceedings. 23andMe moves to stay the declaratory relief action pending resolution of the underlying litigation. Ironshore opposes the motion for stay and argues that an early motion for summary judgment would be appropriate in this case. The Court has considered the briefing and the oral argument presented at the hearing on April 9, 2015. For the reasons discussed below, the motion for stay is GRANTED IN PART AND DENIED IN PART.

**I.　BACKGROUND**

23andMe provides a Personal Genome Service ("PGS") directly to consumers who wish to access and understand their personal genetic information. Consumers enter into a contract with 23andMe to purchase a DNA saliva collection kit and then send a saliva sample back to 23andMe for testing. 23andMe posts the results to the consumer's personal account on a 23andMe website.

During the relevant time frame, the results consisted of the raw genetic data obtained by saliva testing ("DNA Data"), information regarding ancestry ("Ancestry Component"), and information regarding personal genetic traits and personal health ("Health Component").

On November 22, 2013, the United States Food and Drug Administration ("FDA") issued a warning letter stating that sales of the PGS without market clearance or approval violated the Food, Drug and Cosmetic Act. The FDA expressed concerns regarding the Health Component of the PGS, and required 23andMe to stop marketing the Health Component pending FDA approval. 23andMe thereafter stopped offering the Health Component to new consumers.

Subsequently, several legal proceedings were commenced against 23andMe, including a class action in the United States District Court for the Southern District of California, *Casey v. 23andMe, Inc.*, and a consolidated class action in this district, *Tomkins v. 23andMe, Inc.* In addition to the federal actions, two proposed class arbitration complaints were filed before the American Arbitration Association ("AAA"), *Livingston v. 23andMe Inc.* and *Davis-Hudson v. 23andMe, Inc.* The federal actions and arbitration complaints alleged among other things that: 23andMe falsely represented in advertising that the PGS would give consumers knowledge about their health conditions and their status as carriers of genetic disorders; the results actually provided were inaccurate and incomplete; 23andMe misled consumers into believing that the PGS had received government approval; and 23andMe did not disclose to consumers that their genetic information would be used to create a database that 23andMe could market to physicians and pharmaceutical companies. Claims asserted in those proceedings included false advertising under California Business & Professions Code § 17500, unfair competition in violation of California Business & Professions Code § 17200, violation of California's Consumer Legal Remedies Act, deceit, breach of warranty, negligent misrepresentation, and unjust enrichment.

23andMe tendered the defense of the federal actions and arbitration complaints to Ironshore under a "Products/Completed Operations Liability and Professional Liability Policy for Life Sciences" that Ironshore had issued to 23andMe for the period March 19, 2013 to March 19, 2014. Ironshore accepted the defense of the actions, and of a Civil Investigative Demand ("CID") commenced by the State of Washington, under a reservation of rights. Ironshore subsequently

2

filed the present action seeking a judicial declaration that it does not have a duty to defend or indemnify 23andMe in the underlying actions. Ironshore also seeks judicial declarations as to the application of certain specific policy exclusions and limitations. 23andMe moves to stay the declaratory relief action pending resolution of the underlying litigation.

## II.   LEGAL STANDARD

In *Montrose Chemical Corporation of California v. Superior Court ("Montrose I")*, 6 Cal. 4th 287 (1993), the California Supreme Court addressed the circumstances under which it is appropriate to stay an insurer's action for declaratory relief on the issues of its duties to defend or indemnify. "To eliminate the risk of inconsistent factual determinations that could prejudice the insured, a stay of the declaratory relief action pending resolution of the third party suit is appropriate when the coverage question turns on facts to be litigated in the underlying action." *Id.* at 301. In *Montrose Chemical Corporation of California v. Superior Court ("Montrose II")*, 25 Cal. App. 4th 902, 910 (1994), the California Court of Appeal described three ways in which an insured might be prejudiced by concurrent litigation of the declaratory relief and third party actions: (1) the insurer might "join forces with the plaintiffs in the underlying actions as a means to defeat coverage"; (2) the insured might be "compelled to fight a two-front war, doing battle with the plaintiffs in the third party litigation while at the same time devoting its money and its human resources to litigating coverage issues with its carriers"; and (3) "the insured may be collaterally estopped from relitigating any adverse factual findings in the third party action, notwithstanding that any fact found in the insured's favor could not be used to its advantage."

"A stay is *required* in the first and third type of prejudice involving factual overlap." *United Enterprise, Inc. v. Sup. Ct.*, 183 Cal. App. 4th 1004, 1012 (2010). Otherwise, "the question whether to grant a stay or fashion some other remedy is left to the discretion of the trial court." *Id.* "[W]hen the coverage question is logically unrelated to the issues of consequence in the underlying case, the declaratory relief action may properly proceed to judgment." *Montrose I*, 6 Cal. 4th at 302; *accord Great American Ins. Co. v. Sup. Ct.*, 178 Cal. App. 4th 221, 235 (2009) ("[I]f the declaratory relief action can be resolved without prejudice to the insured in the underlying action – by means of undisputed facts, issues of law, or factual issues unrelated to the

3

issues in the underlying action – the declaratory relief action need not be stayed."). In exercising its discretion whether to grant a stay, "the trial court should consider the possibility of prejudice to *both* parties." *Great American*, 178 Cal. App. 4th at 236. "If the insurer is correct and, in fact, it has no further duty to defend, it may nevertheless be required to keep paying defense costs indefinitely while the declaratory relief action is stayed." *Id.* at 236-37. "'For this reason, the trial court should not hesitate to fashion orders which attempt to balance these conflicting concerns.'" *Id.* at 237 (quoting *Montrose II*, 25 Cal. App. 4th at 910).

## III. DISCUSSION

Because a stay is required if either the first or third type of prejudice identified in *Montrose II* exists, the Court begins its analysis there. The first type of prejudice occurs when the insurer "attacks" the insured to such degree that the insurer effectively joins forces with the plaintiffs in the underlying action as a means to defeat coverage. *Montrose II*, 25 Cal. App. 4th at 910. The example given in *Montrose II* was the insurer's description of the insured, Montrose, as "the manufacturer from hell" responsible for "the near extinction of the California brown pelican and the death of untold millions of birds and fish"; "a giant ball of DDT that has imperiled all aquatic life in the [Los Angeles] harbor"; and "numerous large fish kills in the Sacramento River, affecting in particular the winter-run Chinook salmon, listed as a threatened species." *Id.* at 910 n.7. As the *Montrose II* court commented, "[t]hat the plaintiffs in the third party actions would thus describe a defendant is to be expected. That an insurer should jump on the bandwagon while the third party actions are still pending is not." *Id.* The Court concludes that the declaratory relief complaint in the present case does not contain this type of venomous allegation or any other language sufficiently negative to implicate the concern raised in *Montrose II*, and 23andMe does not argue otherwise.

The third type of prejudice occurs when there is substantial factual overlap between the coverage question raised by the declaratory relief action and the underlying litigation, such that "the insured may be collaterally estopped from relitigating any adverse factual findings in the third party action." *Montrose II*, 25 Cal. App. 4th at 910. 23andMe argues that there is such overlap in this case both as to liability issues and damages. In response, Ironshore identifies five defenses to

coverage that it contends can be resolved without addressing any potentially overlapping issues. When an insurer raises multiple defenses to coverage, the trial court must consider each defense separately to decide whether it can be adjudicated without prejudice to the insured. *Haskel, Inc. v. Sup. Ct.*, 33 Cal. App. 4th 963, 979 n.15 (1995) (quoting *Montrose I*, 6 Cal. 4th at 305-06 (conc. opn. of Kennard, J.)). If so, the declaratory relief action need not be stayed. *Id.* Thus the question before the Court is whether each of the defenses asserted by Ironshore may be adjudicated "by means of undisputed facts, issues of law, or factual issues unrelated to the issues in the underlying action." *Great American*, 178 Cal. App. 4th at 235.

Ironshore contends that the following defenses to coverage may be adjudicated without reference to disputed factual issues in the underlying actions: (1) the underlying claims do not seek covered or insurable damages under the policy; (2) the policy's Contract exclusion bars coverage; (3) the policy's Off-Label Promotion exclusion bars coverage; (4) some of the underlying claims do not allege Wrongful Acts as defined by the policy; and (5) the CID does not qualify as a "claim" under the policy.[1]

### 1.    Covered or Insurable Damages

Ironshore alleges that none of the claims in the underlying actions seek covered or insurable damages under the policy. The policy provides professional liability insurance as follows:

> We will pay **Damages** that the **Insured** becomes legally obligated to pay because of a **Claim** alleging a **Wrongful Act** by the **Insured** or by a party for whose conduct the **Insured** may be legally responsible in rendering or failing to render **Professional Services** (including in the course of a **Human Clinical Trial**).

Policy § 1.B., ECF 1-1 (bold in original).[2] "Damages" is defined as follows:

> K.    **Damages** mean compensatory damages in excess of the applicable Deductible or Self-Insured Retention and within the applicable Limit of Liability which are incurred by any **Insured** with the Company's prior written consent. **Damages** do not include:

---

[1] This order addresses only those defenses that Ironshore contends can be litigated without prejudice to 23andMe; it does not address additional defenses raised in Ironshore's complaint.

[2] The policy contains some additional requirements, not at issue here, regarding timing and geography of the Wrongful Act and timing of the claim against the insured.

5

1.    civil or criminal fines, sanctions, penalties or forfeitures;

2.    the multiplied portion of multiplied damage awards;

3.    non-monetary, injunctive, declaratory or equitable relief or amounts owing in order to effectuate such relief;

4.    the return, refund or restitution of fees or other charges for **Your Product**, **Your Work** or your services;

5.    amounts incurred to modify, redesign or correct **Your Product**, **Your Work** or your services, other than expenses covered under Insuring Agreement D;

6.    amounts that are not insurable under any applicable law; or

7.    plaintiff's attorney fees associated with any of the remedies listed in (1) through (6) above.

Policy § VII.K, ECF 1-1 (bold in original).

Ironshore contends that all of the claims in the underlying actions seek either equitable relief (not recoverable under K.1), restitution (not recoverable under K.4), or amounts that are not insurable under California law (not recoverable under K.6). A chart attached to Ironshore's opposition lists the claims asserted by the plaintiffs in the underlying actions. Those claims include: false advertising under California Business & Professions Code § 17500, unfair competition in violation of California Business & Professions Code § 17200, violation of California's Consumer Legal Remedies Act, concealment/intentional misrepresentation, negligent misrepresentation, unjust enrichment, breach of contract, breach of express warranty, breach of implied warranty, and violation of the Illinois Consumer Fraud Act. While on their face a number of the claims potentially could give rise to recovery of damages rather than restitution or equitable relief, Ironshore maintains that despite the claims' labels they actually seek only restitution or disgorgement of the price paid for the PGS. Ironshore asserts that it can prove as much based solely on the face of the underlying complaints and evidence that could be obtained by limited discovery. *See* Def.'s Opp. at 16, ECF 29.

The evidence that Ironshore proposes to submit includes the mediation statement submitted by the plaintiffs in the underlying actions. *See id.* That statement is protected by California's mediation privilege, which is strictly construed. *See* Cal. Evid. Code § 1119; *Cassel v. Sup. Ct.*,

51 Cal. 4th 113, 118 (2011). Ironshore has not demonstrated that this case presents "extreme" circumstances justifying an exception to the privilege. *See Cassel*, 51 Cal. 4th at 119 (holding that the privilege is absolute unless it is waived or its application would give rise to "extreme" situation such as denial of due process). Accordingly, the Court would not permit Ironshore to submit the underlying plaintiffs' mediation statement in this action. Ironshore has not identified any other evidence, nor has it proposed any particular discovery, that would bear on whether the underlying actions seek covered or insurable damages under the policy. Accordingly, Ironshore's motion with respect to this defense turns on whether the defense can be litigated on the face of the pleadings and whether it can be adjudicated without making any factual determinations that could give rise to collateral estoppel in the underlying litigation.

The Court concludes that the answer to both questions is no. To take perhaps the simplest example, which was highlighted by 23andMe's counsel at the hearing, several of the underlying actions assert claims for breach of the implied warranty of merchantability and fitness for a particular purpose. Under California law the remedies for breach of the implied warranty include "benefit of the bargain" damages. *See* Cal. Com. Code § 2714(2) ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."). Ironshore argues that despite the theoretical availability of "benefit of the bargain" damages for a breach of implied warranty, the only recovery actually sought by the plaintiffs in the underlying action is disgorgement or restitution of the "wrongfully acquired" PGS purchase price. *See* Def.'s Opp. at 15, ECF 29. Ironshore cites a number of cases for the proposition that California law precludes indemnification for a wrongdoer's disgorgement of ill-gotten gains. *See, e.g., Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1115 (2006) ("California case law precludes indemnification and reimbursement of claims that seek the restitution of an ill-gotten gain."). The Court concludes that it is not apparent on the face of the underlying pleadings that the plaintiffs in those actions seek only disgorgement or restitution. Moreover, any determination by this Court that Ironshore's revenues from the PGS were ill-gotten or wrongfully acquired would be precisely

7

1  the type of adjudication prohibited by *Montrose II*.

2  Accordingly, the motion for stay is GRANTED with respect to Ironshore's defense that the
3  underlying actions do not seek covered or insurable damages.

### 2. Contract Exclusion

The Court turns next to Ironshore's coverage defense based on the policy's Contract exclusion, which in relevant part excludes coverage for damages or expenses "based upon[,] arising out of, directly or indirectly resulting from or in any way involving":

> **1. Contractual Liability**
>
> Your assumption of liability or obligations in a contract or agreement. This exclusion does not apply to liability or obligations:
>
> a.  that you would have in the absence of the contract or agreement; or
>
> b.  that you assumed in an **Insured Contract**, provided the **Bodily Injury**, **Property Damage** or **Wrongful Act** occurs subsequent to your execution of the **Insured Contract**. However, this exception for liability you assumed in an **Insured Contract** only applies to the extent of any limits or coverage required by the **Insured Contract**. Solely for purposes of the coverage provided by this subparagraph (b), we will treat as **Damages** any attorneys fees or litigation expenses for which you are liable under such **Insured Contract**.

Policy § IV.A.1, ECF 1-1 (bold in original). Ironshore argues that all of the underlying claims are barred by this provision because each plaintiff and class member entered into a contract with 23andMe and thus their claims seek damages arising out of 23andMe's "assumption of liability or obligations in a contract or agreement." Ironshore asserts that application of this provision may be litigated without reference to any facts that are in dispute in the underlying actions and without the need for discovery. 23andMe argues that at least some of the underlying claims arise out of 23andMe's pre-contract advertising and marketing of the PGS and not out of any liability or obligations assumed by the 23andMe under subsequent contracts. 23andMe also points out that the case relied upon by Ironshore, *Medill v. Westport Ins. Corp.*, 143 Cal. App. 4th 819 (2006), is not directly on point because it involved a policy exclusion for loss arising out of *breach* of contract and not an exclusion for damages arising out of *assumption* of liability or obligations in a contract.

While 23andMe raises credible arguments that the Contract exclusion may not apply to at

least some of the underlying claims, the Court at this point need not determine the merits of the defense but only whether it can be litigated at this time without prejudice to 23andMe under the standards set forth in *Montrose I*, *Montrose II*, and their progeny. The parties' dispute regarding applicability of the defense appears to turn largely upon construction of the language used in the Contract exclusion. It is undisputed that each plaintiff and class member ultimately entered into a contract with 23andMe. The parties simply have different views as to whether the underlying claims arise out of 23andMe's "assumption of liability or obligations" under those contracts. It appears that those issues can be resolved as a matter of law based upon the face of the underlying pleadings without determining factual issues that could give rise to collateral estoppel against 23andMe in the underlying actions.

The Court still must consider the second type of prejudice identified in *Montrose II*, that absent a stay of Ironshore's declaratory relief action 23andMe will be "compelled to fight a two-front war." *See Montrose II*, 25 Cal. App. 4th 910. Given the number of underlying actions at issue, requiring 23andMe to devote resources to the declaratory relief action clearly will impose some burden. However, the Court also must consider the prejudice to Ironshore that would result from a stay. *See Great American*, 178 Cal. App. 4th at 236 ("the trial court should consider the possibility of prejudice to both parties"). Ironshore has expended and continues to expend significant resources defending actions for which it contends there is no coverage whatsoever. At the hearing, Ironshore's counsel represented that Ironshore could demonstrate a complete absence of coverage under the Contract exclusion in a limited early motion for summary judgment, without the necessity for discovery. The Court concludes that it is appropriate to grant Ironshore the opportunity to do so under its discretion to "fashion orders which attempt to balance these conflicting concerns." *Montrose II*, 25 Cal. App. 4th at 910.

Accordingly, the motion for stay is DENIED as to Ironshore's coverage defense based upon the Contract exclusion.

### 3.     **Off-Label Promotion Exclusion**

Ironshore alleges that the underlying claims are barred by the policy's Off-Label Promotion exclusion, which in relevant part excludes coverage for damages or expenses "based

upon[,] arising out of, directly or indirectly resulting from or in any way involving" 23andMe's "promotion of off-label or unapproved uses for drugs or medical devices approved by the Food and Drug Administration for other uses." Policy ¶ 4.A.21, ECF 1-1. Specifically, Ironshore asserts that this Court can determine as a matter of law that the underlying claims arise out of Ironshore's unapproved promotion of the PGS, and that the Court need not make any findings regarding 23andMe's scienter in order to reach that determination. After reviewing the pleadings in the underlying actions provided in connection with this motion, and in particular the complaint in the *Tomkins* action, the Court concludes that this coverage defense cannot be litigated without determining factual issues that overlap with the underlying litigation. In order to find that the Off-Label Promotion exclusion applies, the Court would have to make a factual determination that 23andMe promoted "off-label or unapproved uses for drugs or medical devices" that were FDA-approved for other uses, and then would have to conclude that the underlying claims are based upon that promotion. The impact of such determinations on the underlying litigation could be significant, and such impact would not be dissipated simply because the Court did not also make determinations regarding 23andMe's scienter. Thus the Court concludes that litigation of this coverage defense falls squarely within the prohibition of *Montrose II*.

Accordingly, the motion for stay is GRANTED as to the Off-Label Promotion exclusion.

### 4. Wrongful Acts

As set forth above, the policy provides coverage for "**Damages** that the **Insured** becomes legally obligated to pay because of a **Claim** alleging a **Wrongful Act** by the **Insured**." Policy § 1.B., ECF 1-1 (bold in original). "**Wrongful Act** means any actual or alleged negligent act, error or omission in the rendering of, or failure to render **Professional Services** to which this insurance applies." Policy § VII.GGG, ECF 1-1 (bold in original). Ironshore contends that this definition of "Wrongful Act" excludes intentional and reckless acts, and that a number of the underlying claims are based upon intentional or reckless acts. Specifically, Ironshore argues that claims for intentional misrepresentation and violation of the Illinois Consumer Fraud Act are not based upon "Wrongful" – that is, negligent − acts and thus that there is no coverage for those claims. *See* Pl.'s Opp. at 19, ECF 29.

23andMe does not dispute that claims for intentional misconduct are not covered under the policy. However, 23andMe argues that "no purpose would be served in this Court's fashioning a determination that the Policy applies only to negligent acts, errors and omissions" because such a determination could not possibly eliminate Ironshore's duty defend. Pl.'s Reply at 13 n.8, ECF 30. Ironshore's duty to defend continues so long as there is a potential for coverage for any claim in the action. *See State Farm Gen. Ins. Co. v. Mintarsih*, 175 Cal. App. 4th 274, 284 (2009). None of the underlying actions are limited solely to the claims identified by Ironshore as barred by the definition of "Wrongful Act," that is, intentional misrepresentation and violation of the Illinois Consumer Fraud Act. Thus 23andMe is correct in asserting that adjudication of the "Wrongful Act" defense would not relieve Ironshore of its duty to defend the underlying actions.

Before addressing that point further, the Court observes that litigation of the "Wrongful Act" defense could implicate the third type of prejudice discussed in M*ontrose II*. While it may be that certain claims clearly would be excluded from coverage – for example, intentional misrepresentation – it is less clear whether claims such as false advertising and unfair competition likewise would be excluded. Determination whether acts giving rise to those claims were negligent on the one hand or intentional or reckless on the other would overlap with factual merits issues.

Even assuming no factual overlap of the type giving rise to the third type of prejudice, the Court must consider the effect of the second type of prejudice, that is, compelling the insured to fight a two-front war. The Court has concluded that the second type of prejudice does not preclude litigation of Ironshore's Contract exclusion defense because that defense potentially could eliminate Ironshore's duty to defend altogether. In balancing the prejudice to 23andMe if the Contract exclusion defense is litigated at this time against the prejudice to Ironshore if litigation of that defense is stayed, the Court has concluded that Ironshore's significant expenditure of resources defending 23andMe in actions as to which there may be no coverage outweighs the burden to 23andMe of litigating the Contract exclusion defense in the limited manner suggested by Ironshore. However, the balance of prejudice is quite different with respect to Ironshore's defense based upon the definition of "Wrongful Act," because even if Ironshore

11

were successful on that defense it still would have a duty to defend 23andMe in the underlying actions. Under those circumstances, the Court concludes that the burden to 23andMe in fighting a two-front war outweighs Ironshore's interest in obtaining an immediate partial coverage determination that would not alter its duty to defend.

Accordingly, the motion for stay is GRANTED as to the defense based upon the definition of "Wrongful Act."

### 5. CID

Finally, Ironshore asserts that the CID issued by the Washington Attorney General does not qualify as a covered "claim" under the policy. "**Claim** means a written demand for **Damages**, services or other non-monetary relief." Policy § VII.F, ECF 1-1. "A **Claim** includes a **Suit**." *Id.* "Suit" in turn is defined as follows:

> **Suit** means a civil proceeding seeking recovery of **Damages** (or **Damages** plus services or other non-monetary relief) because of a **Wrongful Act**, **Bodily Injury** or **Property Damage** to which this insurance applies. Suit includes a civil legal proceeding as well as an arbitration proceeding or alternative dispute resolution proceeding in which such **Damages** are claimed and to which the insured must submit or does submit with our consent. **Suit** does not include a criminal proceeding.

Policy § VII.AAA, ECF 1-1.

Ironshore asserts that based upon the sparse information that 23andMe has provided, it appears that the CID consists of document requests and interrogatories but does not constitute a written demand for damages, services or other non-monetary relief and does not constitute a "suit." Ironshore argues that the precise nature of the CID could be established with very limited discovery from 23andMe, and that if the CID does not qualify as a "claim" Ironshore's duty to defend the CID proceeding would be eliminated. 23andMe agrees that the Washington Attorney General has not initiated legal proceedings against 23andMe, but asserts that such proceedings may be initiated in the future. 23andMe requests that litigation of whether the CID constitutes a claim under the policy be stayed pending further action by the Washington Attorney General.

It appears that litigation of this defense could eliminate Ironshore's duty to defend with respect to the CID, that such litigation would not require disposition of any overlapping factual issues, and that such litigation could be accomplished in short order after production of

identifiable documents already in 23andMe's possession. Consequently, for the same reasons it has concluded that litigation of the Contract exclusion defense is appropriate at this time, the Court concludes that litigation of this defense is not precluded by *Montrose II* and that the balance of prejudice favors permitting Ironshore to demonstrate the application of the defense in a limited early motion for summary judgment.

Accordingly, the motion for stay is DENIED as to Ironshore's defense that the CID does not qualify as a claim under the policy.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Defendant's motion for stay is DENIED as to Ironshore's coverage defenses based upon the Contract exclusion and the assertion that the CID does not qualify as a covered claim, and GRANTED as to all other coverage defenses raised in Plaintiff's complaint;

(2) Plaintiff may proceed with litigation of its Contract exclusion defense and its defense that the CID does not qualify as a claim under the policy; and

(3) Such litigation may include taking limited discovery from Defendant as to the nature of the CID proceeding and filing an early motion for summary judgment addressing Plaintiff's Contract exclusion defense and its defense that the CID does not qualify as a claim under the policy. Any such motion shall be limited to fifteen pages, any opposition to fifteen pages, and any reply to ten pages.

Dated: May 14, 2015

_____
BETH LABSON FREEMAN
United States District Judge